# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | | |
|---|---|---|
| JENNIFER AFCAN, individually and on behalf of her minor child, J.A., | ) ) ) ) | |
| Plaintiff, | ) ) | 3:07-cv-0258-JWS |
| vs. | ) ) | ORDER AND OPINION |
| UNITED STATES OF AMERICA, | ) ) | [Dkt. 44, 45, 46, 47, 48, 49, 50, 51, 62, 63, 64, 69, 77, and 79] |
| Defendant. | ) ) | |

## I. MOTIONS PRESENTED

At docket 44, the government moves *in limine* to establish the measure of past damages as the amount paid by Medicaid, as opposed to the actual amount of medical care billed. At docket 52, plaintiff Jennifer Afcan filed a non-opposition to the motion.

At docket 45, the government moves *in limine* to dismiss recovery of more than one damage cap for all plaintiffs per AS § 09.55.549. At docket 54, Afcan opposes the motion. At docket 61, the government replies and, at docket 62, moves for leave to file additional factual materials in support of its reply. At docket 63, Afcan moves for oral argument on this motion.

At docket 46, the government moves *in limine* to dismiss recovery of lost wages on Afcan's loss of society and loss of consortium claims. At docket 53, Afcan filed a non-opposition to the motion.

At docket 47, the government moves *in limine* to preclude the use of peer review and quality assurance documents and witnesses who participated in the review. At

docket 55, Afcan opposes the motion. The government replies at docket 71. At docket 64, Afcan moves for oral argument on this motion.

At docket 48, Afcan moves to exclude late-disclosed evidence, produced after the discovery deadline. At docket 60, the government opposes the motion. Afcan replies at docket 66.

At docket 49, Afcan moves to strike the expert report and testimony of Ronald Keller. At docket 59, the government opposes the motion. Afcan replies at docket 67.

At docket 50, Afcan moves to strike the expert report and testimony of Thomas Koch. At docket 57, the government opposes the motion. Afcan replies at docket 68 and, at docket 69, moves for leave to file additional materials in support of her reply.

At docket 51, Afcan moves for a protective order precluding any assertion of comparative negligence at trial. At docket 58, the government opposes the motion. Afcan replies at docket 65.

At docket 77, Afcan moves to strike the expert rebuttal report and exclude related testimony of Dr. Jerrold Milstein. At docket 78, the government opposes the motion and, at docket 79, cross-moves to strike the testimony of Dr. Bernard McNamara exceeding the scope of his initial report. Afcan opposes the motion at docket 83.

## II. BACKGROUND

On January 4, 2007, Afcan took J.A., her then fourteen-month-old son, to St. Mary's Subregional Clinic for treatment of an abscess and a fever. Ken Johnson, the physician's assistant on duty, examined J.A., observing that he had a temperature of 100.8, a pulse of 147, respiration of 28, and a 6 cm by 6 cm area of redness on his right buttock. Johnson sent J.A. home with an antibiotic and an instruction to apply a warm compress to "promote drainage." Believing that J.A.'s condition had worsened later that day, Afcan returned to the clinic. The second examination revealed that J.A.'s temperature had risen to 105.6, that his pulse was 206, and his respiratory rate was 64. Johnson instructed a health aide to place J.A. in a cool bath. Johnson also drew a small sample of blood, and analysis of J.A.'s white blood cell count revealed leukocytosis. After J.A.'s fever decreased to 101, Johnson sent him home with Motrin

and Tylenol, with instructions to continue the antibiotic. Afcan claims she was instructed not to return to the clinic unless J.A.'s fever went back up.

On January 8, 2007, Afcan returned with J.A. to the clinic to be seen by a different medical provider. That provider found an "unresolved gluteal abscess, fever, and possible sepsis." J.A. was transported to the Yukon Kuskokwim Delta Regional Hospital ("YKDRH") in Bethel and, after purportedly waiting two hours to be treated, was finally treated and subsequently transported to the Alaska Native Medical Center ("ANMC"). At the ANMC, J.A. was found to be suffering from MRSA-related sepsis and end organ failure. He was intubated for the first 12 days of his month-long hospitalization and has now been found to suffer from neuro-developmental and behavioral disabilities.

## III.  DISCUSSION

### A. Motions for Oral Argument at Dockets 63 and 64

Afcan's requests for oral argument at dockets 63 and 64 are denied. Oral argument would not assist the court in resolving the pending motions.

### B. Unopposed Motions at Dockets 44 and 46

The government's motions at dockets 44 and 46 are unopposed and therefore granted.

### C. Motions at Dockets 45 and 62

As an initial matter, the court grants the government's request at docket 62 for leave to file additional factual materials in support of its reply. Those materials were attached to the motion and are deemed to have been filed with the court. The government seeks an order, pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissing any claim that Afcan and J.A. may assert to separately recover non-economic damages up to the amount capped by AS § 09.55.549. The motion stems from Afcan's amendment to her administrative complaint adding herself as a second plaintiff with an independent loss of society claim, which the government believes is suggestive of her intent to seek double non-economic damages. Afcan argues that, because Johnson's conduct was reckless, the damage cap is inapplicable. Moreover, Afcan claims that even if the court were to conclude that Johnson's conduct was not

reckless, plaintiffs are not limited to one damage cap because there exist three separate instances of injurious conduct, which occurred at three different times. Afcan points to several authorities purportedly establishing that the damages cap applies to each act, and is only intended to limit recovery for multiple injuries resulting from a single act.[1] The government responds that Afcan's claim of recklessness is without merit, and that asserting such a claim may raise subject matter jurisdiction issues vis-à-vis the government's failure to waive sovereign immunity from a punitive damages award.[2] The court considers the parties' arguments below.

With regard to Afcan's allegation that Johnson acted recklessly, the court declines to rule at this time. As both parties recognize, there are numerous factual issues in dispute, which will be resolved at trial. However, with regard to Afcan's claim that she and J.A. are each entitled to non-economic damages arising from the three separate instances of alleged negligence, the court finds that AS § 09.55.549 specifically limits the amount of damages that may be awarded in "loss of consortium claim[s] or other derivative claim[s] arising out of a single injury." The court declines to accept Afcan's invitation to construe AS § 09.55.549 to permit her to recover damages beyond the cap as a matter of first impression. Although Afcan strenuously argues that three separate negligent events led to J.A.'s injury, the authorities upon which she relies all involve cases where multiple negligent events led to "distinct compensable injuries."[3] Here, it is apparent that J.A. has suffered a single injury as a result of the various acts of alleged negligence by multiple medical providers, the exact scenario for which the damages cap was designed. As a result, the court grants the government's motion to the extent it seeks dismissal of a claim for double non-economic damages based on multiple acts. If Afcan wishes to pierce the damages cap on the basis of purported recklessness, she is free to pursue that theory at trial. The government's concern that

---

[1] Docket 54 at 6-9 (citing cases).

[2] *See* AS § 09.55.549(d).

[3] *C.J. v. State Dept. Of Corrections*, 151 P.3d 373, 383 (Alaska 2006); *see also Kodiak Island Borough v. Roe*, 63 P.3d 1009, 1016 (Alaska 2003).

breaking the cap for reckless behavior is akin to allowing punitive damages is not adequately briefed, and so is not decided here. However, it may be noted that this theory strikes the court as one unlikely to be correct. Non-economic damages are a species of compensatory damages. As such, they differ from punitive damages, which are not meant to compensate the victim, but to deter the defendant and others.

**D. Motion at Docket 47**

The government next seeks to preclude Afcan from introducing peer review and quality assurance documents and testimony regarding the same on the ground that such evidence is privileged under § 805 of the Indian Health Care Improvement Reauthorization and Extension Act of 2009 ("IHCIREA"),[4] as well as by state law privilege according to an unpublished order in *Johnson v. United States* issued by Judge H. Russel Holland in 2001.[5] The government claims that this information was produced to Afcan in error. Afcan claims, on the other hand, that the government has waived its privilege, and that because this material was produced prior to the passage of the IHCIREA, the amendment is inapplicable. Moreover, Afcan argues that state privilege for medical peer review and quality assurance documents is inapplicable. Afcan claims that even if Alaska state law precludes use of the documents, it does not preclude testimony by witnesses who participated in the review. If those witnesses were permitted to testify, Afcan continues, she should be permitted to impeach them under Federal Rule of Evidence 613 in the event they provide testimony inconsistent with the documents at trial.

Section 805(b) of the IHCIREA states that "[m]edical quality assurance records created by or for an Indian health program or a health program of an urban Indian organization as part of a medical quality assurance program are confidential and

---

[4] *See* docket 47-1 at 2-4 (The Indian Health Care Improvement Reauthorization and Extension Act of 2009, as enacted by the Patient Protection and Affordable Care Act, Pub. L. 111-148 § 10221, 124 Stat. 119, 935 (March 23, 2010), hereinafter referenced by docket number).

[5] *See* docket 47-6 (Order on Motion to Compel in *Johnson v. United States*, No. A99-0567-CV (HRH) (D. Alaska 2001)).

-5-

privileged. Such records may not be disclosed to any person or entity, except as provided in subsection (d)."[6] "Medical quality assurance records" include "proceedings, records, minutes, and reports that . . . emanate from quality assurance programs described in paragraph (2)."[7] Section 805(a)(2) of the IHCIREA, by its terms, applies to medical quality assurance programs "carried out before, on, or after the date of enactment of the Indian Health Care Improvement Reauthorization and Extension Act of 2009."[8] Where Congress has clearly provided that a statute will apply retroactively, the analysis goes no further.[9] Here, the use of the term "before" indicates that Congress intended this section - including the confidentiality and privilege protections at issue - to apply retroactively to medical quality assurance records created *before* its enactment. Afcan's argument that the term "before" is insufficient to confer retroactive status on § 805(b) is unpersuasive. Therefore, the § 805(b) privilege applies.

The peer review and quality assurance documents were not federally privileged at the time of disclosure. However, they may have been privileged under state law at the time of disclosure. Therefore, it is necessary to determine whether a state law privilege existed at the time of disclosure. An opinion of this court, *Johnson v. United States*, found as a matter of law that "state privilege law governs the discovery of peer review materials,"[10] citing AS § 18.23.030.[11] Having reviewed *Johnson* and AS

---

[6] Docket 47-1 at 2 (Section 805(b)).

[7] *Id.* (Section 805(a)(3)(A)).

[8] *Id.* (Section 805(a)(2)).

[9] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70 (1994).

[10] Docket 47-6 at 12-13 (Order on Motion to Compel in *Johnson v. United States*, No. A99-0567-CV (HRH) (D. Alaska 2001)).

[11] That statute states that "all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and may not be disclosed to anyone except to the extent necessary to carry out the purposes of the review organization and is not subject to subpoena or discovery. Except as provided in (b) of this section, a person described in AS 18.23.020 may not disclose what transpired at a meeting of a review organization except to the extent necessary to carry out the purposes of a review organization, and the proceedings and records of a review organization are not subject to discovery or

§ 18.23.030, the court concludes that Alaska's privilege law applies to the peer review and quality assurance documents at issue in this case. Because this privilege existed at the time of disclosure, the next question is whether the government waived the state law privilege when it disclosed the documents to Afcan.

Whether analyzed under Alaska Rule of Evidence 510 or Federal Rule of Evidence 502, the government has clearly waived its privilege over the peer review and quality assurance reports at issue. The government voluntarily disclosed the peer review materials on January 29, 2010, and failed to object to Afcan's motion to amend her complaint on March 19, 2010, based on these newly-discovered materials. It was only on March 26, 2010 - days after the enactment of § 805(b) of the IHCIREA - that the government first suggested that it would seek to claw back the peer review and quality assurance reports on the basis of the new federal privilege. However, this court recognized a state law privilege under AS § 18.23.030 in Federal Tort Claims Act suits in 2001, and the government's argument that it could not "waive[] a privilege that did not even exist" therefore fails. The court finds that peer review and quality assurance documents produced to Afcan are privileged under § 805 of the IHCIREA and AS § 18.23.030, as discussed in *Johnson v. United States*. Because the government did not take reasonable steps to protect its privilege after voluntarily disclosing the peer review and quality assurance documents, the privilege is deemed waived.

The court turns to Afcan's argument that she should be permitted to examine the individuals responsible for preparing the peer review and quality assurance reports. The privilege created by AS § 18.23.030 "does not reach any information, documents, or records that are independently available from third parties," including "member[s] of a peer review committee, or a person who testified before the committee."[12] Such individuals "cannot be prevented from testifying in a civil action about matters within their knowledge - though they cannot be asked about what they said to the peer review

---

introduction into evidence in a civil action against a health care provider arising out of the matter that is the subject of consideration by the review organization. " AS § 18.23.030(a).

[12] *Grandstaff v. State*, 171 P.3d 1176, 1193 (Alaska App. 2007).

committee, or about the opinions they formed as a result of their participation in peer review proceedings."[13] Moreover, the court disagrees with Afcan's assertion that Rule 613 may be used to circumvent the clear statutory language foreclosing use of peer review information. Therefore, while Afcan will be permitted to call members of the peer review committee to the stand, she will be extremely limited in what she can ask them.

**E. Motion at Docket 48**

Plaintiff moves to exclude all discovery produced after March 26, 2010. Specifically, Afcan wants the court to exclude the school records of J.A.'s biological siblings, which were only produced on June 8, 2010. Afcan argues that these records were key to the testimony of her experts, Jill Friedman and Francis Gallela, who were deposed on June 1, 2010, and had no opportunity to review them. The government claims that a release from J.A.'s biological mother - Marcia Boots - was requested prior to the expiration of the discovery deadline, that the release and records were only obtained after several delays, and that introduction of these materials will not be prejudicial to Afcan. Afcan counters that the government has had since at least November 3, 2009, when she served defense counsel with Boots' medical records, to obtain these records, alleging that the government's failure to obtain the records within the discovery deadline was not justified.

The court agrees. At docket 38, the court specifically stated that no additional discovery would be authorized. The government may not now seek to flout the court's mandate by claiming that new discovery would only be used as rebuttal or impeachment evidence, particularly when Afcan has not been given the benefit of the same records.[14] Having found that the government's failure was not substantially justified or harmless,

---

[13] *Id.* at 1193-94.

[14] *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

-8-

Case 3:07-cv-00258-JWS   Document 84   Filed 08/06/10   Page 8 of 12

the court precludes use of the school records of J.A.'s biological siblings for any purpose.

**F. Motion at Docket 49**

Afcan also moves to strike the expert report of and preclude testimony by defense expert Ronald Keller on the ground that the government failed to submit Dr. Keller's IME report before the May 14, 2010 expert report deadline imposed by the court at docket 38. The government counters that, because the deadline for conducting the IME was May 21, 2010, and the IME was timely conducted on May 19, 2010, the IME report could not logically be excluded because it would have been impossible to produce prior to the examination. The court agrees. Because the IME examination deadline came after the expert report deadline, the IME report could not be produced within the expert report deadline. Afcan's claim that the government waited too long to obtain an IME examination is irrelevant - the government complied with the court's order, conducted the IME examination in a timely fashion, and produced the resulting report immediately after the examination was completed. Therefore, the court deems the IME examination report timely produced.

Afcan next claims that Dr. Keller lacks sufficient expertise and the methodological reliability necessary for admission of his opinion into evidence. Specifically, Afcan claims that Dr. Keller has no experience in "life care planning," a topic on which he opines at length. The government contends that there is "no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor."[15] Having reviewed Dr. Keller's report and credentials, the court sees no reason why Dr. Keller - a pediatrician of 37 years - should be precluded, on motion, from testifying about a child's "life plan" or potential therapeutic solutions to the behavioral problems of a child. The court therefore denies Afcan's request to strike Dr. Keller's report and exclude his testimony.

---

[15]Docket 59 at 7 (quoting *Doe v. Cutter Biological Inc.,* 971 F.2d 375, 385 (9th Cir. 1992)).

**G. Motions at Dockets 50 and 69**

As an initial matter, Afcan's motion at docket 69 for leave to file additional factual materials in support of her reply brief is granted. The materials lodged at docket 70 are deemed to have been filed. Afcan moves to strike the expert report and exclude testimony of Dr. Thomas Koch because his report allegedly "fails to utilize the correct medical standard in this case and, as a result, his testimony on material matters lacks sufficient relevance and helpfulness necessary for its admission into evidence."[16] Afcan claims that Dr. Koch's use of the phrase "beyond a doubt" in reference to the cause of J.A.'s developmental and behavioral disability refers to a higher standard of proof than Afcan need establish in order to prove causation. The government counters that, while Dr. Koch used the phrase in the summary of his opinion, his analysis merely states that he is "not convinced of any direct causal relationship" between the alleged negligence and J.A's disability.[17] Moreover, Dr. Koch's report suggests that other factors played a role in J.A.'s disability, including "fetal alcohol exposure, frequent recurrent ear infections as well as unknown genetic factors and psychosocial risks before and after birth."[18] The government concludes that there would be no risk of confusion about the appropriate standard because this case will ultimately be tried before the court, and not a jury. The government has the more persuasive argument. Having reviewed Dr. Koch's report and credentials, the court concludes that Dr. Koch possesses the relevant qualifications to present testimony on the neuro-developmental issues presented in this case. Afcan is free to question Dr. Koch about his methodology and conclusions at trial.

**H. Motion at Docket 51**

Afcan next moves to preclude the government from asserting a defense of comparative negligence at trial. As the government correctly notes, Afcan's motion is

---

[16] Docket 50 at 1.

[17] *See also* docket 57-2 (Affidavit of Dr. Thomas Koch stating that his opinions represent a reasonable degree of medical certainty).

[18] Docket 57-1 at 3.

essentially one for summary judgment on the issue of comparative fault, and the court construes it as such. With respect to the apportionment of damages, Afcan is correct that her comparative negligence may not be imputed to J.A.[19] However, the government is correct that Afcan could be responsible to J.A. for all or part of his damages, depending on the court's determination of percentages of fault.[20] Nevertheless, because there are disputed issues of fact with respect to Afcan's level of responsibility, the motion is denied. The government may pursue its comparative negligence theory at trial.

**I. Motions at Dockets 77 and 79**

Finally, Afcan moves to strike the expert "rebuttal" report and exclude related testimony of Dr. Jerrold Milstein. Afcan claims that, although "rebuttal" reports were never authorized by the scheduling order, the government nevertheless served Dr. Milstein's untimely "rebuttal" report one month after the expert report deadline. The government counters that Dr. Milstein was compelled to write a rebuttal report, which Afcan received on June 21, 2010, after Dr. McNamara's June 6, 2010 discovery deposition revealed a shift in opinion, raised several new issues, and cited to additional scientific research. In addition, the government argues that, should the court strike the rebuttal report of Dr. Milstein, Dr. McNamara's testimony exceeding his written report should similarly be excluded. Afcan responds that the government cannot now move to exclude Dr. McNamara's testimony because it has already taken his trial perpetuation testimony without objection to its scope.

Having reviewed the reports of Drs. Milstein and McNamara, as well as the discovery deposition of Dr. McNamara leading to Dr. Milstein's second report, the court believes that Dr. McNamara's discovery deposition testimony exceeded the scope of his initial expert report in the ways articulated in the government's brief at docket 78.

---

[19]*Sinclair v. Okata,* 874 F. Supp. 1051, 1059 n.55 (D. Alaska 1994) ("Under Alaska law, any negligence of the plaintiffs would not bar their claim but would only diminish proportionately the amount they are entitled to receive in damages. Finally, . . . [a parent's] alleged negligence in failing to supervise her children would be [not] imputed to [her child].").

[20]AS § 09.17.080(c).

-11-

However, because Dr. Milstein's rebuttal report was disclosed before the government took Dr. McNamara's trial perpetuation testimony on June 25, 2010, there was ample time for Dr. McNamara to address the contents of the rebuttal report and to clarify any inconsistent positions he took in his discovery deposition. Therefore, the court declines to strike Dr. Milstein's rebuttal report or exclude the deposition or trial testimony of either Drs. McNamara or Milstein.

## IV.  CONCLUSION

For the reasons set out above, the court rules as follows:

(1) Afcan's motions for oral argument at dockets 63 and 64 are **DENIED**.

(2) The government's unopposed motions at dockets 44 and 46 are **GRANTED**.

(3) The government's motions at docket 45 and 62 are **GRANTED** as discussed above.

(4) The government's motion at docket 47 is **GRANTED** in part and **DENIED** in part as discussed above.

(5) Afcan's motion at docket 48 is **GRANTED**.

(6) Afcan's motion at docket 49 is **DENIED**.

(7) Afcan's motion at docket 69 is **GRANTED**.

(8) Afcan's motion at docket 50 is **DENIED**.

(9) Afcan's motion at docket 51 is **DENIED**.

(10) Afcan's motion at docket 77 and the government's cross-motion at docket 79 are **DENIED**.

DATED at Anchorage, Alaska, this 6th day of August 2010.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

Case 3:07-cv-00258-JWS   Document 84   Filed 08/06/10   Page 12 of 12