# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JENNIFER AFCAN, individually and on behalf of her minor child, J.A., | 3:07-cv-00258 JWS |
| Plaintiff, | ORDER AND OPINION |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## I. INTRODUCTION AND RULING ON RESERVED MOTIONS

This Federal Tort Claims Act medical malpractice action was tried to the court from February 22, 2011, through February 28, 2011. In its Answer to the Complaint, the United States admitted that the St. Mary's Subregional Clinic and the Yukon Kuskokwim Health Corporation ("YKHC") should be treated as being within the United States Public Health Service and that their employees were acting within the scope of their employment at all times relevant to this litigation. Pursuant to Federal Rule of Civil Procedure 52, the court sets out its findings of fact and conclusions of law below.

For reasons which will become apparent upon reading the findings and conclusions, the oral motions made at trial by defendant to dismiss plaintiff's claim for subsistence loss damages and for wage loss damages are **DENIED** as moot.

## II. FINDINGS OF FACT

The parties stipulated to and the court relies on the following facts which are quoted from docket 89. The court has divided the quoted material into numerous short paragraphs and numbered each paragraph but has made no other changes.

1. On Thursday, January 4, 2007, Jennifer Afcan took her 14-month-old son, J.A., to the St. Mary's Subregional Clinic because he had an approximate one-week history of a painful abscess on his buttock, and she also complained that he had a fever.

2. Ken Johnson, the physician assistant assigned to the clinic, examined J.A. at 2:43 p.m. The vitals were recorded as a temperature of 100.8, a pulse of 147, and a respiratory rate of 28.

3. Mr. Johnson noted that J.A. was "cranky" and had a 6 by 6 cm. area of redness on his right buttock, with a 1-2 cm. area of central induration and a pain assessment of 6 out of 10. No exudate was noted at the time.

4. J.A. was sent home on antibiotics (cotrimoxazole) (known as Septra) with an instruction to apply warm compresses "to promote drainage."

5. Mr. Johnson noted that he hoped antibiotics and warm compresses would be curative, but he told Ms. Afcan that the abscess would "most likely require I & D (incision and drainage). He instructed Ms. Afcan to "f/u [follow-up] with the next provider."

6. Ms. Afcan returned J.A. to the clinic later the same day at 9:02 p.m., and J.A. was again seen by Ken Johnson. At this visit the pain assessment was 10 out of 10, the vitals were recorded as a temperature of 105.6, a pulse of 206, and a respiratory rate of 64.

7. Under "chief complaint" it was noted "Rx Motrin and sponge bath, was seen earlier today for boil Rx Septra, mouth red, unconsolable (sic) sometimes."

8. In the repeat assessment, J.A. was noted to be "miserable-crying," the right ear was "red, bulged cloudy and not mobile and the left ear pink grey retracted clear/cloudy [questionable] mobility" and "bottom with abscess." The temperature was noted to decrease to 102.9 by 9:45 p.m. and to 101.0 by 10:30 p.m.

9. J.A. was sent home with Motrin and Tylenol, and instructions to continue the Septra. The clinic's medical record notes that Ms. Afcan should "f/u tomorrow." She was not given a copy of the record.

10. From Friday through Sunday, J.A. slept more and cried only when awake. He ate very little and took fluids only through a syringe. During this time period, the abscess grew in size and no longer had a shape or center.

11. On Monday, 01/08/07, Ms. Afcan returned with J.A. to the clinic. His vitals were a temperature of 99.8, a pulse of 170, and a respiratory rate of 28. John Moore, the new physician assistant, examined J.A. and contacted Dr. Mosely, a Yukon Kuskokwim Health Corporation (YKHC) physician, at 3:15 p.m.

12. Ms. Afcan and J.A. were transported to Bethel on a commercial flight which was held for them.

13. Once at the YKHC hospital, J.A. was triaged, and at 5:45 p.m. his vital signs were recorded as a temperature of 99.2, a pulse of 146, a respiratory rate of 56, and blood pressure at 119/64. He was given IV fluids and IV antibiotic, Vancomycin, Tylenol, and Morphine.

14. An aeromed was ordered. The aeromed arrived at the emergency room at 12:10 a.m. in the morning. The aeromed arrived in Anchorage at 4:20 a.m. and at the Alaska Native Medical Center (ANMC) at 5:03 a.m.

15. Upon arrival at ANMC on January 9, 2007, J.A. was somewhat alert, but within an hour he became less responsive. His blood pressure had fallen to 70/40 and his pulse was 190. J.A. was found to be in septic shock.

16. J.A. was intubated due to respiratory failure and placed on a ventilator. Intravenous fluids and medications were administered to treat poor perfusion (flow of blood through the vessels of the body).

17. Surgery was performed at the bedside to incise and drain the abscess on his right buttock.

18. J.A. was admitted to the Pediatric Critical Care Unit at ANMC with the following diagnoses:
- * Cellulitis/abscess - right buttock/thigh
- * Septic shock
- * Cardiovascular failure insufficiency that developed into failure
- * Respiratory failure

    * Acute renal failure

  19. A blood culture collected grew Staphylococcus hominis, and a wound culture grew Methicillin Resistant Staphylococcus aureaus (MRSA).

  20. J.A. was treated on the Pediatric Critical Care Unit for 15 days. He was maintained in a medically induced coma for 12 days, during which time he was on a ventilator to mechanically sustain his breathing.

  21. He was transferred to the general pediatric floor, where he was treated for an additional 14 days. He was discharged on February 6, 2007 and remained in Anchorage for follow-up.

  The court makes the following additional findings based on the trial testimony and the exhibits admitted in evidence.

  22. J.A. was discharged by Dr. Eric Noble, a board certified pediatrician who had been working at ANMC as an in-patient pediatrician since 2000. Dr. Noble observed and noted J.A. to be "a vigorous toddler walking around the ward." Dr. Noble had a distinct memory of that visit with J.A. Dr. Noble also noted that J.A. still had three open wounds on his buttock. These were from three of the several tunnel incisions made to drain the abscess. Dr. Noble discharged J.A. because care for the wounds could be provided on an out-patient basis. Dr. Noble thought that J.A. improved rapidly from his lengthy hospitalization.

  23. Jennifer Afcan kept J.A. in an Anchorage hotel immediately following the discharge, and his wounds were periodically repacked by an ANMC nurse who visited daily.

  24. During much of the time that J.A. was in the ICU, his entire body appeared to be swollen.

  25. While in the hospital, J.A.'s pain was so severe that he had to be treated with morphine. This eventually required that J.A. go thorough the process of being weaned off the drug. The weaning process caused tremors.

  26. J.A. was seen on February 13, 2007, for a check of his wounds. The medical record of that visit states, among other things: "Boil o— smiling, active, no

-4-

Case 3:07-cv-00258-JWS   Document 131   Filed 03/02/11   Page 4 of 12

distress noted. Methadone taper." The examination showed "NAD [no acute distress], alert, playful/laughing."

27. J.A. was next seen on February 20, 2007. By that time only one of the wounds was still open. Jennifer reported that J.A. was eating and drinking well and had no fevers. She stated that she wanted to go home. The child was observed to be a "happy baby exploring room walking." The record notes that J.A. was released to return to St. Mary's the next day if he had no fever.

28. Bernard J. McNamara is a physician who is board certified in emergency medicine, infectious diseases, and internal medicine. The court qualified Dr. McNamara to give opinion testimony within these fields. He testified that the standard of care applicable to the treatment of an abscess or boil by a physician assistant is to incise and drain the abscess. He acknowledged that with respect to a very small boil, the use of an alternative such as a warm compress could be acceptable. Dr. McNamara testified that Ken Johnson's treatment of J.A. on January 4, 2007, fell below the standard of care, because he did not incise and drain the abscess.

29. Physician assistant Ken Johnson testified that it is not appropriate to incise and drain every boil. When the boil feels hard upon palpation, proper treatment calls for the use of warm compresses first. He acknowledged that most abscesses must eventually be incised and drained. On January 4, 2007, when he first saw J.A., he prescribed the use of hot compresses to "ripen" the boil. He told Jennifer Afcan that J.A.'s boil would likely have to be incised and drained.

30. Johnson measured the cellulitis surrounding J.A.'s abscess during the first visit on January 4, 2007, finding it to be 6 cm. by 6 cm. He measured the abscess itself to be about 2 cm. by 2 cm., roughly the size of a quarter.

31. Johnson's customary practice is to palpate an abscess using two fingers. He is confident that he palpated the abscess during the first visit because he measured it. There is nothing in the medical records to show that Johnson either palpated or measured the abscess during the second visit on January 4, 2007. Johnson has no independent recollection of what he did with respect to the abscess during the second visit.

-5-

Case 3:07-cv-00258-JWS   Document 131   Filed 03/02/11   Page 5 of 12

32. Emily Paukan is a community health aid who has about 20 years of experience and was on call at the St. Mary's clinic on the evening of January 4, 2007. She did not see J.A. on the first visit during the day. She saw J.A. during the second visit. She wrote the only notes concerning J.A.'s second visit on that date. The notes do not show that J.A.'s abscess was measured or palpated during the second visit.

33. When Jennifer came to the clinic the second time on January 4, 2007, Johnson was not at the clinic, but in his living quarters nearby. Paukan had to go find him. Neither Paukan nor Johnson was happy to be called to the clinic that evening. Both of them were "grumpy."

34. Johnson knew that there was a significant risk that follow-up instructions given to patients at the St. Mary's clinic might not be followed correctly. The instruction given after the first visit on January 4, 2007, was to follow-up with the next provider, meaning the physician assistant who would replace Johnson when his shift in the village ended.

35. During the second visit, Johnson himself gave no instruction to Jennifer about follow-up. Emily Paukan wrote "follow-up tomorrow" in the record of the second visit, and testified that she must have told Jennifer that. Jennifer testified persuasively that at the second visit she was told to follow-up if J.A. "fevered," meaning that his fever increased.

36. Jennifer Afcan was not given any written instructions about follow-up. She did not see the note Paukan wrote to follow-up tomorrow. She was not given an appointment time for the next day. Considering all the circumstances, including Johnson's and Paukan's grumpy attitudes and Jennifer's demonstrated ability to monitor fever and present J.A. when his fever did go up, the instructions actually communicated to Jennifer were confusing. She reasonably interpreted them to mean not to bother Johnson or Paukan unless J.A.'s fever increased.

37. When J.A. was sent home following the second visit, he was on a Motrin and Tylenol regimen for fever reduction which lowered his temperature significantly during the visit and could be expected to keep the fever in check.

38. Guidelines published by YKHC for the treatment of boils indicate that a standard procedure for treating an abscess is to incise and drain it. The guidelines also say that in some circumstances incision and drainage would not be appropriate.

39. The YKHC guidelines state that on initial exam "it is important to mark the circumference of the erythema as this gives you a baseline and makes it easier to assess healing and worsening of cellulitis." Johnson did not do this on the initial exam. In his opinion measuring was an adequate substitute. The failure to outline the problem area would have made it more difficult to access changes in condition at the time of the second visit.

40. The YKHC guidelines point out that in less than 10% of cases there are risks of wider infection, sepsis, scarring, and pain attendant on incising and draining an abscess.

41. No physician testified that the YKHC guidelines constitute the standard of care.

42. No physician other than Dr. McNamara testified as to the standard of care applicable to Johnson's treatment of J.A.

43. Johnson was aware that MRSA infections are widespread in the St. Mary's region. His prescription of generic Septra without a culture confirming the presence of MRSA was an appropriate action and demonstrated care in dealing with the risk of MRSA.

44. John Moore was the physician assistant who came to St. Mary's to replace Ken Johnson when Johnson's shift ended and he left the village. Moore was on duty on Monday, January 8, 2007, when Jennifer brought J.A. back to the clinic.

45. When Moore first saw J.A. he looked "extremely ill." He was lethargic. The abscess had covered one buttock and spread to the other. He knew immediately that J.A.'s illness was caused by the abscess. The abscess was a cherry red color. Moore called Dr. Mosely in Bethel as soon as possible. He told Dr. Mosely that J.A. needed to be transported to Bethel.

46. Based on his review of the records of the two visits on January 4, 2007, Moore testified that had he seen J.A. the second time, he would have called the pediatrician in Bethel for advice. Johnson did not make such a call.

47. Subsequent to his hospitalization, J.A. had frequent and serious temper tantrums, speech difficulties, and other problems which were of great concern to his mother. She moved to Anchorage where J.A. could receive services to assist with his problems. Eventually, J.A. was referred to Dr. Ronald Brennan for a neuro-developmental consultation by J.A.'s pediatrician, Dr. William Browner.

48. Dr. Brennan saw J.A. on October 7, 2009. Dr. Brennan had some, but not all of J.A.'s medical records. Dr. Brennan diagnosed J.A. with neurological disorder which he described as static encephalopathy manifesting in developmental delay and behavioral problems.

49. Dr. Browner did not diagnose J.A. as having developmental delay, but he made numerous referrals to others in which he wrote that J.A. had developmental delay.

50. Joseph T. Capell is a physician who is board certified in pediatrics, physical medicine and rehabilitation, and pediatric rehabilitation. The court qualified Dr. Capell to give opinion testimony within these fields of specialization. Dr. Capell has diagnosed and treated a very large number of children who are developmentally delayed. Based on his review of the medical records, Dr. Capell found that J.A. had a developmental delay in language and life care skills. Dr. Capell reviewed Jill Friedman's Life Care Plan for J.A. and worked with Karen Aznavoorian to develop her Life Care Plan for J.A. Both plans are intended to identify appropriate services which will help J.A. deal with his developmental delay.

51. Dr. McNamara testified that in his opinion, J.A.'s neurological disorder was caused by the sepsis resulting from the abscess. Dr. McNamara has no specialized training in pediatric neurology. He has no specialized training in neurology. Dr. McNamara has no significant experience treating neurological disorders other than in an emergency room setting. He has no significant experience following the course of patients with neurological disorders. His opinion was based largely on reading a handful of articles published by others. His opinion was unconvincing.

52. Jerrold M. Millstein is a physician who is board certified in pediatrics, neurology, and pediatric neurology.  The court qualified Dr. Millstein to give opinion testimony within these fields of specialization.  Dr. Millstein has many years of experience diagnosing and treating patients with neurological disorders.  Dr. Millstein testified convincingly that J.A.'s sepsis did not cause his neurological disorder.  He disagreed with Dr. McNamara's report and testified that the literature upon which Dr. McNamara relied did not provide good support for Dr. McNamara's opinion.   In forming his opinion, Dr. Millstein did not review the report from Dr. Koch.

53. Thomas K. Koch is a physician who is board certified in pediatrics, neurology, and pediatric neurology. The court qualified Dr. Koch to give opinion testimony within these fields of specialization.  Like Dr. Millstein, Dr. Koch has many years of experience in the diagnosis and treatment of patients with neurological problems.  Dr. Koch testified persuasively that there is no evidence to support the proposition that J.A.'s sepsis caused his neurological disorder.  Dr. Koch had reviewed Dr. McNamara's report and disagreed with it.  Dr. Koch said the only article relied upon by McNamara worth mentioning was the article by Dr. Hsu, whose conclusion was speculative and which called for further research.  In forming his opinion, Dr. Koch did not review the report from Dr. Millstein.

54. The damages recoverable by plaintiff arising from Johnson's breach of the standard of care are limited to those associated with the incident of sepsis and do not include any associated with J.A.'s neurological disorder, because it was not caused by the sepsis.

55. Defendant moved at docket 44 to limit plaintiff's recovery of past economic damages to the amount paid by Medicaid.  Plaintiff did not oppose the motion, and it was granted in an order at docket 84.  The total amount paid by Medicaid as reflected in Exhibits 32 and P is $139,385.18.

56. Based upon a review of the medical records and relevant testimony, the court concludes that all Medicaid payments for J.A.'s care during the period of January 8, 2007, when J.A. was diagnosed with sepsis through his discharge from ANMC on February 6, 2007, are reimbursable to Medicare.  In addition, all costs

associated with follow-up thereafter concerning the healing of the remaining open wounds, the associated cellulitis, weaning of J.A. off opiates, nurse visits, check ups on the status of J.A. post hospitalization, and all associated transportation and living costs are reimbursable to Medicare. None of the payments relating to J.A.'s developmental delay are reimbursable to Medicare. The court finds that the sum of the Medicaid payments which plaintiff is entitled to recover subject to the Medicaid lien is $88,939.

57. Jennifer Afcan witnessed and J.A. suffered great pain and discomfort caused by the sepsis: J.A. nearly died. He was placed in an induced coma for 12 days. His body was swollen for an extended period. He was on a ventilator for 12 days. His pain was so great that he was given morphine. He became addicted to Morphine. He had to be weaned off the opiate. The weaning process caused tremors. J.A. endured a long hospitalization at ANMC, most of which was in the ICU. He endured treatment of open wounds even after he was discharged from the hospital. These non-economic injuries are substantial. A fair and reasonable amount of money to compensate J.A. for these injuries is $45,000.

58. Jennifer Afcan experienced great suffering and emotional distress and loss of J.A.'s society as he underwent the ordeal described in the preceding paragraph. In addition, unlike J.A., Jennifer had a full appreciation of the risks J.A. confronted. She also has and will have troubling memories of the ordeal which the infant will not. Jennifer Afcan was forced to endure relocation from her home in a small rural community to Anchorage. The close bond between the mother and infant was weakened by the ordeal and more likely than not will never be fully re-established. A fair and reasonable amount to compensate Jennifer Afcan for suffering, emotional distress, and loss of consortium caused by the sepsis is $100,000.

-10-

Case 3:07-cv-00258-JWS   Document 131   Filed 03/02/11   Page 10 of 12

## III. CONCLUSIONS OF LAW

1. The substantive law which applies to this dispute is the law of the State of Alaska where the events took place. *See* 28 U.S.C. § 2674 (United States liable in same manner and to same extent as private litigant in same circumstances).

2. Under Alaska law, to recover damages on a medical malpractice claim, a plaintiff must prove by a preponderance of evidence the applicable standard of care, a breach of the standard of care, and damages caused by the breach. AS 09.55.540.

3. Plaintiff has proved by a preponderance of the evidence that the applicable standard of care required an incision and drainage no later than the time of the second visit on January 4, 2007. Plaintiff has proved by a preponderance that Johnson violated the standard of care. Plaintiff has proved by a preponderance of the evidence that this violation caused J.A.'s sepsis.

4. Plaintiff has not proved by a preponderance of the evidence that Johnson's conduct was reckless or grossly negligent. The failure to incise and drain was based on a rational, if in the circumstances faulty, plan that in other situations might have been appropriate. In addition, the prescription of generic Septra represented an attempt to address J.A.'s possible MRSA infection.

5. Defendant contends that Jennifer Afcan was comparatively negligent because she did not bring J.A. to the clinic between the second visit on January 4, 2007, and the visit on January 8, 2007. The absence of explicit, clear follow-up instructions dooms this claim. Defendant has not proved by a preponderance of the evidence that Jennifer Afcan was negligent in not bringing J.A. to the clinic during that time period.

6. Plaintiffs have not proved by a preponderance of the evidence that J.A.'s neurological disorder was caused by J.A.'s sepsis.

7. Plaintiff's damages are limited to those associated with the sepsis and do not include any economic or non-economic losses or costs associated with J.A.'s developmental delay.

8. Plaintiff's has proved economic damages of $88,939 by a preponderance of the evidence.

9.  Plaintiff has proved non-economic damages for J. A. of $45,000, and non-economic damages for Jennifer Afcan of $100,000.

10.  Even though Alaska law ordinarily permits a prevailing plaintiff in tort litigation to recover a measure of attorney's fees, a plaintiff in a Federal Tort Claims act case may not recover attorney's fees from the United States.  *Anderson v. United States*, 127 F.3d 1190, 1191 (9th Cir. 1997).  Similarly, plaintiff may not recover costs from the United States.  *Id.*, 127 F.3d at 1191-2.

## IV.  DIRECTION FOR ENTRY OF JUDGMENT

The Clerk of Court will please enter judgment that plaintiff recover damages from the United States in the total amount of $233,939 and recite in the judgment that this total is comprised of economic damages of $88,939 and non-economic damages of $145,000.  The judgment is not to include any provision for the recovery of costs or attorney's fees.

DATED at Anchorage, Alaska this 2nd day of March 2011.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE